Filed 7/20/22  In re William H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re WILLIAM H. et al., Persons Coming Under the Juvenile Court Law. | B314838<br><br>(Los Angeles County Super. Ct. No. 18CCJP02139A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MAYRA C.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Mayra C., the mother of 13-year-old William H., nine-year-old Taylor H. and six-year-old Curon H., appeals the August 31, 2021 order terminating her parental rights pursuant to Welfare and Institutions Code section 366.26,[1] contending the juvenile court erred in ruling she had failed to establish the beneficial parental relationship exception to termination (§ 366.26, subd. (c)(1)(B)(i)).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petitions and Mayra's Failed Reunification Efforts*

On July 16, 2018 the juvenile court sustained a dependency petition pursuant to section 300, subdivision (b)(1), finding, as alleged by the Los Angeles County Department of Children and Family Services, that Mayra and the children's father, William H., Sr., had a history of engaging in violent physical altercations in the presence of the children and that William H., Sr.'s violent conduct toward Mayra and Mayra's failure to protect the children endangered the children's physical health and safety.  William, Taylor and Curon were declared dependent children of the court, removed from their parents' custody and placed in the home of the maternal grandparents, where they had resided since an emergency detention hearing in April 2018.  The

_____

[1]     Statutory references are to this code.

2

court ordered family reunification services and monitored visitation for both parents. Mayra was directed to participate in a domestic violence support group for victims, a parenting course and individual counseling and to undergo a mental health assessment.

The Department's status review report for the six-month review hearing (§ 366.21, subd. (e)) stated Mayra, who was homeless, continued to maintain a relationship with William H., Sr. A last minute information for the court, filed January 14, 2019, reported William H., Sr. had been arrested in mid-December following another physical attack on Mayra. Mayra's visits with the children were monitored by the maternal grandparents, who indicated Mayra "is struggling with showing up to the visits and does not visit regularly." At the hearing the court found the parents had made no progress toward mitigating or alleviating the causes for the children's placement.

The status review report for the 12-month review hearing (§ 366.21, subd. (f)) stated Mayra had been placed on a psychiatric hold in mid-May 2019 following an attempted suicide. The attempt apparently took place several days after Mayra struck the maternal grandmother during an argument. Mayra's visits with the children remained monitored due to her minimal progress with court-ordered services. At the hearing the court terminated reunification services for William H., Sr., who remained incarcerated following the December 2018 domestic violence incident, while continuing services for Mayra.

By the 18-month review hearing (§ 366.22) in December 2019 and January 2020, Mayra had made significant progress with her case plan. Her visitation with the children had been liberalized to unmonitored, and the court ordered them released

to Mayra once she secured appropriate housing. In the interim the maternal grandmother told the social worker she did not want Mayra living in her home with her and the children.

Mayra obtained housing on April 25, 2020, and the children were placed in her care on May 1, 2020. The Department noted the children were bonded with the maternal grandmother and the move back to Mayra was difficult for them.

On July 14, 2020, following reports that Mayra was once more in a physically abusive relationship, the children were again detained and returned to the maternal grandparents' home. The following week the Department filed a subsequent petition (§ 342, subd. (a)) alleging Mayra and her male companion had a history of engaging in violent altercations in the presence of the children with Mayra once again the victim of the domestic violence. The section 342 petition, as amended, was sustained in September 2020.[2] The court ordered twice weekly monitored visitation, but found Mayra ineligible for further reunification services and scheduled a section 366.26 selection and implementation hearing.

2. *The Section 366.26 Selection and Implementation Hearing*

In its report for the section 366.26 hearing, originally scheduled for January 8, 2021, the Department explained the maternal grandmother, who previously agreed she, the maternal grandfather and a maternal uncle would be co-legal guardians of the children, now believed adoption would be best for the children and stated she wanted to adopt them. Because of the change in recommendation from legal guardianship to adoption, the

---

[2] An allegation Mayra had physically abused William by throwing a game controller at him was dismissed.

4

Department requested a 120-day continuance to allow it to explain adoption to the children. Regarding visitation, the report stated Mayra "sporadically will call and visit the children." The court continued the hearing to May 11, 2021.

In a status review report filed in February 2021, the Department advised the court the children had adjusted well to being back in their grandparents' home, where they were happy and felt safe. Once again Mayra's visits were described as "sporadic" and "inconsistent." During the visits Mayra brought food and engaged with the children. However, the maternal grandmother, who monitored the visits, stated "the children usually want to cut the visit short and do not want to engage with their mother." All three children said they liked living with their grandparents. William and Taylor said they wanted to be adopted by them.

A last minute information for the court, filed May 7, 2021, reported the assessment of the grandparents' home had been approved and the children appeared bonded to the grandparents. The maternal grandparents stated they were committed to the permanent plan of adoption; and the children, when interviewed by a social worker, stated they would like to be adopted by their maternal relatives.

The hearing was again continued, this time to August 31, 2021, to allow the Department to provide proper notice to William H., Sr. A status review report for that date reiterated the sporadic nature of Mayra's visits with the children. The maternal grandmother described the visits as occurring less and less frequently and indicated Mayra would go about a month and a half without visiting or calling the children. According to the social worker, the maternal grandmother also stated "the

5

children usually want to cut the visit short and do not want to engage with their mother for a long period of time."  The children again expressed their desire to continue to live with the maternal grandparents, and William and Taylor repeatedly said they wanted to be adopted by them.

Mayra did not appear at the hearing on August 31, 2021.  Her counsel advised the court, "I do not know where Mother is.  She indicated to me that she would be present."  Counsel requested a continuance so Mayra could attend the hearing; the court denied the request for lack of good cause.

As it did in its reports, which were admitted into evidence, the Department recommended the court find the children were adoptable and no exception to adoption applied and terminate parental rights.  In response Mayra's counsel stated, without elaboration, "Mother would be objecting to terminating her parental rights.  I would argue that the (c)(1)(B)(i) exception applies.  Mother does visit the children.  She does not visit as much as they would like.  She is extremely bonded to the children.  So she would ask that the court find that (c)(1)(B)(i) appll[ies]."[3]

Minors' counsel joined the Department's recommendation and noted Mayra had only sporadic visits with the children and "there have been times where she's gone for a month, month and a half without visiting or calling the children."  Counsel also stated William, who was then 12 years old, had informed her that he wanted to proceed with adoption by his grandparents.

The court found by clear and convincing evidence the children were adoptable and it would be detrimental for them to

---

[3]    Counsel for William H., Sr., also objected to termination of parental rights.

be returned to their parents.  The court rejected Mayra's argument the parental relationship exception applied, stating on the record, "The parents have not acted in a parental—have not assumed a parental role in the lives of these children for a significant period of time.  The court finds that no exception[s] to adoption apply in this case."  The minute orders for the August 31, 2021 hearing recite, with far more detail than the court's brief statement during the hearing, "The Court finds that any benefit accruing to the child from his/her relationship with the parent(s) is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in the best interests of the child."[4]

---

[4]     Although William, Taylor and Curon had remained together throughout the dependency proceedings, the maternal grandparents were identified as the prospective adoptive parents for all three children, and the sibling relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(v)) had not been mentioned during the August 31, 2021 hearing, least of all by the court, the minute orders stated, "The Court finds there will not be a substantial interference with the relationship between the child and the child's sibling(s) and that any risk of loss of ongoing contact between the child and the child's sibling(s) is outweighed by the long-term benefit to the child from the permanency and stability of adoption."

    Including in its minute orders findings not actually made by the juvenile court undermines the integrity of the proceedings and is, at the very least, a disservice to the parties and to this court.  We have previously criticized this practice, which is not confined to this courtroom at Edelman's Children's Court. (E.g., *In re T.G.* (2020) 58 Cal.App.5th 275, 298, fn. 20.)  That it persists is deeply troubling.

7

The court terminated Mayra's and William H., Sr.'s parental rights and transferred care, custody and control of the children to the Department for adoptive planning and placement. The maternal grandparents were designated prospective adoptive parents.

Mayra filed a timely notice of appeal.

## DISCUSSION

1. *Governing Law and Standard of Review*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).)  Once the court has decided to end parent-child reunification services, the legislative preference is for adoption.  (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"].)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing.  First, it determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time.  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re J.W.* (2018) 26 Cal.App.5th 263, 266.)  Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies.  (§ 366.26, subd. (c)(1)(A) & (B); see *Caden C.*, at p. 630.)

One of the statutory exceptions to termination is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court

to order some other permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  As the Supreme Court explained in *Caden C.*, *supra*, 11 Cal.5th 614, decided three months before the section 366.26 hearing in this case, the exception requires the parent to establish, by a preponderance of the evidence, (1) the parent has maintained regular visitation and contact with the child, "taking into account the extent of visitation permitted"; (2) the child has a substantial, positive, emotional attachment to the parent such that the child would benefit from continuing the relationship; and (3) terminating the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Id.* at p. 636; see *id.* at p. 630 ["[t]he language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child"].)  When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption.  (*Id.* at p. 634.)  However, "'[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights."  (*Id.* at p. 633.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the

9

child and the existence of a beneficial parental relationship for substantial evidence.  (*Caden C., supra*, 11 Cal.5th at pp. 639-640; cf. *In re R.V.* (2015) 61 Cal.4th 181, 200-201 ["[t]here is, however, no single formulation of the substantial evidence test for all its applications"; where a party fails to meet its burden on an issue in the juvenile court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the juvenile court could not reasonably reject it"].)  We review the third step—whether termination of parental rights would be detrimental to the child due to the child's relationship with his or her parent—for abuse of discretion.  (*Caden C.*, at p. 640.)

> 2. *The Juvenile Court Did Not Abuse Its Discretion in Concluding Mayra Failed To Establish the Parental Relationship Exception*

Although, as discussed, it was Mayra's burden to establish the parental relationship exception, her counsel, bound by an evidentiary record devoid of facts that would support a finding the exception applied, made only a perfunctory effort at the August 31, 2021 hearing to persuade the court not to terminate parental rights.  Counsel stated Mayra visited with the children, yet acknowledged she had not done so regularly and provided no explanation for that failure.  He asserted Mayra was bonded with the children without discussing the nature of the children's relationship to her and omitted entirely any mention of the essential third element—whether terminating the relationship between Mayra and the children and choosing adoption as their permanent plan would be more harmful than beneficial to them.

For its part, faced with Mayra's contention the parental relationship exception applied, the juvenile court made no findings (at least, as reflected in the reporter's transcript of the hearing) regarding the three elements of the exception discussed

by the Supreme Court in *Caden C.*, *supra*, 11 Cal.5th 614. Instead, relying on pre-*Caden C.* case law, the court simply found neither Mayra nor William H., Sr. had "assumed a parental role in the lives of these children for a significant period of time." (See, e.g., *In re Breanna S.* (2017) 8 Cal.App.5th 636, 646 ["[n]o matter how loving and frequent the contact, and notwithstanding the existence of an "'emotional bond'" with the child, "'the parents must show that they occupy 'a parental role' in the child's life"'"], disapproved on a related ground in *Caden C.*, at p. 637, fn. 6.) Yet the analysis in *Caden C.* made clear that proving a parental role had been maintained was not in every case a prerequisite to establishing the parental relationship exception. While it would be destabilizing for a child to lose "a strong, positive, and affirming relationship" (*Caden C.*, at p. 634), the Court recognized other types of relationship may be significant enough to be preserved: "Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid.*)

A number of courts of appeal, evaluating a juvenile court order terminating parental rights without a full analysis of the applicability of the parental relationship exception as articulated in *Caden C.*, *supra*, 11 Cal.5th 614, have reversed and remanded the matter with directions to conduct a new section 366.26 hearing that conforms to the requirements of that decision. (E.g., *In re D.P.* (2022) 76 Cal.App.5th 153, 170; *In re D.M.* (2021) 71 Cal.App.5th 261, 271; *In re J.D.* (2021) 70 Cal.App.5th 833, 870.) On this record, however, no practical purpose would be served by a remand. (See generally *In re Jesusa V.* (2004) 32 Cal.4th 588, 624 [harmless error doctrine applies in

11

dependency cases]; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1128 [same].)

a. *Regular visitation and contact*

Although Mayra visited the children when they were living with their maternal grandparents during the first two years of the dependency proceedings, she failed to do so on a consistent basis, particularly during the initial period of their out-of-home placement. As the Department reported, notwithstanding authorization for monitored visitation, between the children's initial detention in early April 2018 and the jurisdiction hearing in July 2018, the children saw their mother only through the front gate of the maternal grandparents' home. There were no monitored visits. And while Mayra did begin to visit following the disposition hearing, through the January 2019 six-month review hearing her visits were irregular.

More importantly as it relates to the parental relationship exception, after the children were detained following the filing of the section 342 petition in July 2020, Mayra's visits were sporadic; and she did not visit or call the children for extended periods of time notwithstanding court authorization for two monitored visits per week. Thus, although the juvenile court did not address the visitation element, the record lacks substantial evidence that would support a finding Mayra maintained regular visitation and contact with her children to the extent permitted by court orders. (See *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [juvenile court did not abuse its discretion in finding beneficial parental relationship exception did not apply where it was undisputed "there were significant lapses" in mother's visitation]; *In re C.F.* (2011) 193 Cal.App.4th 549, 554 [juvenile court did not abuse its discretion in finding

exception did not apply where "overall [the mother's] visitation was sporadic"].)

### b. *Beneficial relationship*

The Department's reports are replete with observations that William, the oldest child, and to a lesser extent Taylor, the middle child, were traumatized by the violence between Mayra and William H., Sr. to which they had been exposed. Neither boy wanted to return to live with Mayra. Moreover, although Mayra insisted she had a strong bond with the children and was described as being engaged with them during visits, the unilateral nature of that relationship was evidenced by the children's lack of engagement and desire to end visits early during the year preceding the section 366.26 hearing. Nothing in this record demonstrated the children had "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship," as required for the second element of the parental relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

### c. *Detriment from termination of the relationship*

The ultimate question, of course, is not simply how consistently Mayra visited the children or whether they enjoyed a net positive relationship notwithstanding the difficulties Mayra experienced as a result of the cycle of domestic violence in which she was enmeshed, but whether the benefits of stability and permanence through adoption by the maternal grandparents— with whom the children had been living for most of the past three years and where they felt safe—was outweighed by the harm that would be caused by severing the children's

13

relationship with Mayra.  The juvenile court impliedly found no such detriment in terminating parental rights.

Mayra disputes that finding, but she has not demonstrated the court's conclusion was arbitrary or irrational, let alone that this case presents the type of "exceptional circumstance" that would warrant departure from the norm of adoption.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631 [the parent-child exception, like the other statutory exceptions to termination of parental rights, is a departure from "'the norm'" of adoption and applies only in "'exceptional circumstances'"]; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53.)  To the contrary, given the minimal evidence that any positive relationship actually existed between Mayra and her children, that decision was well within the court's discretion.

## DISPOSITION

The juvenile court's August 31, 2021 order terminating parental rights is affirmed.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

14